Thank you, counsel. I understand we have a road map as to how you intend to proceed. Let me see if I have it right. I'm going to do the Davis v. Equity Plus case first. Yes, Your Honor. And you're arguing for Equity Plus securities. The Yageo group, yes. Then we're going to have the 12-minutes worth. Is that right? That's right. Then we're having 25 minutes of the Benjamin Act case or the Plaintiff in that case. And then we're going to have the other case. And I'm not going to treat the two of them as one for this purpose and not try to govern time, govern your own time. All right.  And thanks for giving us the extra time. Thank you. We believe, on behalf of the defendants, the Yageo parties, that the central issues in this case can be resolved by reviewing just five pages of the record. And I'd like to walk the Court through those and explain why I feel that way. The central piece is the jury instruction that told the jury the core finding on liability. At page 229 of the excerpts of record, Judge Alsop said, liability in this case depends, in the first instance, upon whether the board's decision to commence bankruptcy proceedings was improper. If you find that it was proper to commence bankruptcy, then all claims against the defendants must fail. The special verdict asked the jury, and this is pages 232 to 234 of the excerpts, asked the jury to value long-life stock as of the filing of the bankruptcy. And the Court may recall that when the jury brought back its verdict, there was some ambiguity in it. Judge Alsop sent them back to reconsider. And he gave a curative instruction, which makes clear that what the jury was being asked to do was value the company as of the moment before the filing of bankruptcy. Judge Alsop said that the question meant whether the plaintiffs had proven the stock, quote, had any value as of immediately before the company's petition to commence bankruptcy proceedings on May 1, I'm sorry, May 9, 2001. That's at page 255 of the record. And it instructs the jury to make a before and after comparison. So that moment, the filing of bankruptcy, is the fulcrum of this case. No one challenged any of the jury instructions. No one challenged the jury's findings as being unsupported by the evidence. When you take these pieces together, what they demonstrate is that what the case is about, and all that it is about at bottom, is the filing of the bankruptcy, whether it was a proper filing. There's a lot of discussion about the decision to file the bankruptcy. But as far as the jury was instructed, and in terms of the findings that it made, everything rolls forward into that moment when the bankruptcy was filed.  Well, you talk at that level of abstraction, yes. But the question is improper in what sense or for what reason? I mean, if it wasn't improper for any reason having to do with the bankruptcy laws, then why is there a problem? Well, you're trying to draw a distinction between the decision to make to file the bankruptcy and the filing of the bankruptcy. I'm not sure that's the distinction that's being made. Go ahead. Just the opposite, Your Honor, and I'm sorry if I didn't make myself clear. To us, the ---- You're saying that your opposing party is making that distinction. Exactly. And I'm saying I'm not clear that that's the distinction that's essential to the ---- if you're running into the preemption question, which seems to me to be the core of this. Certainly. I'm not sure that that's the distinction. Obviously, the way the decision was made is what's being said to be improper about this, but improper in a corporate governance sense as between the pieces of the corporation, not as between the debtors and the creditors or any third parties. Well, that's certainly true. There's no question that the claim of impropriety had to do with the director's conduct. But when we talk about the director's conduct, ultimately that's part of the good faith that goes into the filing of a bankruptcy, that a bankruptcy court ---- Do you have any support for that proposition, that you could go to bankruptcy court and say that this case should be dismissed because the decision was made in dereliction of the defender of the director's duties to the corporation? Well, yes, Your Honor, because essentially that claim ---- it's important to keep in mind that since a corporation is an entity, it can only act through its directors and officers. They are the intent of the corporation. And so when they make the decision to file bankruptcy, if they are acting with a bad motive, it's exactly the same as when Mr. Gonzales, as an individual, filed his bankruptcy in the Gonzales case. That was claimed to be a frivolous bankruptcy. It was claimed that it was ---- But this isn't being claimed to be a frivolous bankruptcy. They're not saying there was anything wrong with this as a matter of bankruptcy  They're saying, you know, maybe bankruptcy was a viable legal option, but it wasn't the option that was best for the shareholders. Well, actually, they're saying that it was not a valid option. The pleadings from day one ---- A valid option or not an option ---- not a valid option with regard to the bankruptcy laws, that there wasn't a showing that met the requirements of the bankruptcy  Well, Your Honor, the bankruptcy law doesn't have a rule that says it draws a bright line, and that's part of the problem with the case, that in terms of evaluating what the good faith is, motive is clearly a factor. This Court's discussion in the Marsh case, which cited in our guarantee, which has a rather scholarly discussion as to what courts consider in terms of the impetus for filing bankruptcy and the motives for filing bankruptcy, make it clear that the good faith situation is a very broad one. And certainly courts have considered it, cases like this in the after case, where, again, the issue was someone being induced to file a bankruptcy that was claimed to be wrongful. Bankruptcy can be wrongful for a whole lot of reasons. And for a company to take the extreme remedy of bankruptcy for a purpose that is not for the benefit of the creditors, you know, in other words, if the directors of the claim. They're not claiming that it wasn't for the benefit of the creditors. They're saying it was unwise with regard to the shareholders. I know. But I'm not sure the distinction matters very much because if the bankruptcy statute deals with the relationship between the corporation and the creditors, it doesn't deal with the relationship between the internal relationships of the corporation. Actually, I believe it does. Essentially, when a company goes into bankruptcy, the bankruptcy court and the bankruptcy system has plenary power to adjust the relationships of everybody who touches that debtor. And, of course, it's true we think of bankruptcy principally as between debtor and creditor. But the shareholders are very much affected by bankruptcy. In this case, the bankruptcy cost the shareholders the value of their shares. Management officers are affected by it. And most importantly, Your Honor, this bankruptcy, in this bankruptcy, the trustee, if there was to be a claim asserted against the directors for the filing, this bankruptcy trustee had the power to assert it. It's a claim owned by the debtor. We're here on the basis of the bankruptcy. That's a different issue, right, because, I mean, you can assert lots of claims during the bankruptcy that are not under the bankruptcy law or preempted by the bankruptcy law. There's a stay, and you have to go within the bankruptcy court. But here, there's another argument about this, I know, but it came out the other end of the bankruptcy. That's a different problem, the question of whether or not this was an outside claim, not under the bankruptcy laws, that could have been asserted within the bankruptcy, but the settlement of the bankruptcy or the plan basically let it survive the bankruptcy is a different issue than a preemption issue. They're not related to each other, are they? Well, I recognize that that's not the same issue, but the point we're making is that the filing of the bankruptcy petition is the central act of any bankruptcy. It's the single most important act. It's what starts the whole system in motion. And trying to parse director's motives, if you can draw a line and say, well, this motive is a bad motive that's enough to bring it within the bankruptcy law and preemption, but that motive, even though allegedly a bad motive isn't enough to sweep it within, those are lines that under the kind of preemption that this Court has decreed for the bankruptcy code and the bankruptcy courts is too fine a line to draw. And the problem is this. When directors are sitting down to make their decision as to whether to take their company into bankruptcy, the real problem in a case like this is that they're in a situation where they have no idea what kind of claims might be asserted against them later on that might come after the bankruptcy. They should be entitled to look to a single body of law, the bankruptcy law, and to a single court system which is set up to administer that law. Even within the bankruptcy law, they're not entitled to look to a single body of law because they can be subject to pre-petition claims. It's just a question of how and where they're adjudicated. Before the argument concludes on your part, I want you to address whether you waived the preemption argument. It wasn't raised at trial. It was toward the end, Your Honor, and in some early colloquies, and those are laid out in our brief. But the real issue that divides it, so we don't think we waived it, but the real issue that divides the parties is whether this is subject matter jurisdiction that is waivable at all. If this is preemption, if this is the kind of exclusive preemption that this Court has found in Gonzales and MSR and Miles v. Okun, then we could have raised it for the first time on appeal because of the trial. Maybe this is choice of law? Well, that's the other side's argument. But after all, we have not just the Bankruptcy Code but the forum, the bankruptcy courts. There's really only one place you can administer these laws. And if I'm right that the director's good faith is something that needs to be measured under the Bankruptcy Code and by a bankruptcy court, how they exercise that good faith, the standards by which they exercise it have to flow from the bankruptcy law. And if there's going to be a uniform system of bankruptcy administration, it has to be administered in that court system. It's not – this is only a very rough analogy, but it's not completely unlike the National Labor Relations Board having first crack basically at a wide variety of subjects because it is the body that Congress has set up to deal with certain kinds of labor – labor issues. And state courts, even district courts, can't touch them. So from that perspective, if there is complete preemption, it can't be waived. Returning, if I can, Judge Berzon, to your question, I think as a matter of policy, it's important to have all of these bankruptcy filing decisions swept under the same roof, swept under the bankruptcy court's jurisdiction, because if we try to draw the kind of lines Your Honor is suggesting, then by and large, the directors are never going to know what law is going to govern their decision. Another question. What precisely in the Bankruptcy Act do you say is preemptive here? It's not a specific section of the Bankruptcy Act. And is this – I'm sorry? That's unusual. I mean, usually you have a cause of action. You're saying it shouldn't have been this cause of action. It should have been that cause of action, or there should have been X under the bankruptcy laws. That's true, although – What should they have done under the bankruptcy laws? This Court's jurisprudence suggests that it arises from the comprehensive scheme itself, from the many different ways in which the bankruptcy code amount of time is. So this is a complete preemption kind of preemption, because you're saying there is no cause of action that could have substituted for this. Well, not exactly. Good faith is a requirement of every bankruptcy filing. You're not supposed to confirm a plan unless you find good faith. There's another thing, which is that the purported bad faith here is not by the bankrupt. I'm sorry? The purported bad faith is not by the bankrupt. Well, yes, it is. No, it's by the directors. It's by the directors, but the directors are the bankrupt. Well, apparently not, because we have a lawsuit between the two of them. No, I understand that. But the same is true in Gonzales, where the lawyer, the claim against the lawyer, was also preempted. The same is true in the Astor case, where the other party, the non-party, the third party, induced the person to file bankruptcy. I mean, ultimately, all of this comes under the aegis of the Bankruptcy Court, because it's the – it seems to be what Congress intended in terms of sorting out the debtors' relationships with everybody out there. They don't just have to be creditors. And certainly the directors and officers are right at the heart of the process. I see I've gone over my time. Thank you. Thank you very much. Good morning. May it please the Court. I'm Rodney Petula, appearing for the Dux Parties. Looking for a bright line in the preemption area under bankruptcy law can sometimes be difficult. And I noticed in reviewing the briefs and getting ready for oral argument that I think we finally found it, but it took several briefs to get there. And, in fact, I didn't really see it until the brief we filed on March 10th of this year, which is about the 8th or 9th of this year, which is the 9th brief in all of these appeals. And I think the bright line is quite simple. And it was – I guess it was there all – it was in front of me all the time, but I couldn't see it. The simple fact is that none of the claims for relief asserted in this case arise from a creditor-debtor relationship in the first place. And that has many implications. It's true that I have the same reaction to your briefs, which is, finally, they're getting there. Well, I've got a history of being slow, Your Honor. I think one of the conspicuous – one of the conspicuous shifts in this case, if you look carefully, is that if you look at the first brief on preemption by the agio parties, they emphasize Section 1112B, you know, the bad faith filing of a bankruptcy petition. But by the time we get to the last brief they file, 1112B is dropped out of the equation entirely. And the reason for that is quite simple. As this Court held in the Marsh case, 1112B applies to petitions that are filed in bad faith to harass or deter creditors. It's a creditor protection device. And as a matter of fact, the preemption and even the res judicata issues in this case, I think, are readily resolved once this one bright light point – bright line point is made and kept in mind. And that is that all of these claims have independent legal significance under State law. They in no way implicate bankruptcy policy. They don't affect the plan. They don't affect the relationships between anyone who was a creditor or a debtor or even among creditors as such. I mean, there's sort of – I don't know if we would call it preemption. I mean, there's another intersection of the bankruptcy laws with this cause of action, which is that it did have to be asserted or at least filed as a claim in the bankruptcy. But it was. Is that right? It was actually an asset of the estate. It wasn't a creditor's claim, of course. It was the debtor's claim that we're talking about. And, of course, the debtor, as a matter of policy, should have the latitude to deal with that claim in whatever way is appropriate in the context of a particular bankruptcy. In this case, the bankruptcy trustee chose to settle disputes with the Ducks clients by assigning this asset, this claim, to Ducks in exchange for other consideration. And the bankruptcy court approved that, and no one appealed that. So there's no question about the validity of the assignment. But true enough, the claim was a prepetition asset of the debtor, and I think that probably is the – My point was simply that it did have to be dealt with in a bankruptcy in some fashion.  If it hadn't been in any fashion, if it hadn't come out the other end, and I understand there's a dispute about whether it did come out the other end, but if it didn't come out the other end, it would have been dismissed with the plan, and in that sense it would be gone as well. Right. And under the test of whether or not the claim pertains to the plan, I think the – probably the best, again, bright-light principle here is that res judicata does not require one to raise an independent state law claim unless the resolution of that claim explicitly becomes an essential element or requirement of the bankruptcy plan that's being confirmed. In other words, that's the test for pertaining to. The fact is that this claim and its resolution had no impact upon the LLNC bankruptcy. The – I think it's significant that the principal case relied upon by Yagio in opposition to this and in support of their res judicata defense is the Kelly case. And Kelly – But wait a minute. It certainly had an impact because it was an asset. Yes. So it had to be in the estate as an asset. Yes, but – And something had to happen to it. Right. But the resolution of the claim had no impact. What – the resolution in the sense of the ultimate disposition or adjudication of the claim, what happened here, Your Honor, is that the claim as an inchoate asset of the debtor was sold out of the estate, like many other assets might be sold or disposed of. Then my clients took the asset, the inchoate claim, filed an action in State court on that claim. It was ultimately removed to Federal court where it was adjudicated to a jury. So, yes, it had – the – certainly the claim has a connection to the bankruptcy in the limited sense that it was an asset that went into the estate, but its adjudication had no impact and has no impact on the bankruptcy proceeding itself. The Kelly case, upon which the Yagio defendants principally relied for their res judicata argument, needs to be looked at with great care because the emphasis in the Kelly case by this Court was that the claim that was to be precluded by res judicata arose from the same nucleus of operative facts that – of other claims and positions that were actually litigated in the bankruptcy prior to confirmation and were part of the confirmation order. In the parlance of non-bankruptcy litigators, this was a compulsory counterclaim. In other words, the reason the claim that was precluded was precluded by the confirmation order is because that claim was a compulsory counterclaim in the bankruptcy. That draws the very distinction here. Obviously, this was not a compulsory counterclaim to anything that was asserted in the LLNC bankruptcy. Judge Fletcher raised the question of waiver of the preemption issue. We think that's a very important issue. In particular, the way this preemption has been argued, first of all, it wasn't argued in the district court and certainly wasn't argued before trial. Preemption, if it is choice of law preemption, is clearly a matter of defense, and this Court has held that several times, including the Gilchrist case. And MSR recognizes that as well, MSR Exploration. The existence of a Federal preemption defense does not generally affect jurisdiction. The only time it will is if we're talking about choice of forum preemption. Are we talking about choice of forum preemption? Well, sometimes it sounds like we are in the briefs, but not really. Not when you really look at what the core is of this argument. What they're saying is that the bankruptcy laws preempt State law, because if you recognize the State law claim, it will be substantively inconsistent. Well, I think there are two elements of this, and I recollect that Miles v. Oken said something like this, that, A, there's a substantive law, but there's B, there's a substantive law, and that's the fact that this scheme aims to gather everything into a certain place, a certain jurisdiction, which isn't just Federal jurisdiction, but it's the bankruptcy court. So the fact that this was ultimately tried in Federal court is really not the answer, and the question is, should it have been before the bankruptcy court? Well, perhaps, although I think that the way the argument is being made now, at least on appeal, and it really wasn't made below, all we really have is what we see, I think, in these briefs. The argument is what's really being made is that there's conflict preemption here. You can't really argue in this circuit and any other circuit that I know of that the bankruptcy code occupies the field. I mean, we have ---- That's how I understand their argument. That's why I was trying to get them to be specific about what it is, and the answer seems to be everything. Well, we have State insolvency laws that stand side by side with bankruptcy. It's obvious that the Congress did not intend and did not intend to occupy the field. That form of preemption is not here. There is no express preemption under the code that they claim and nothing that we can find. So what is it? Well, it seems to be in a never-never land of policy interference. What they're saying is that the preemption and preemptive reach of the code is so expansive that anything that's within a hand grenade's distance from the bankruptcy court is preempted. And there's no greater articulation or principle that they offer for the preemption, and that's not the way this form of preemption works. This is not occupying the field. There is no conflict. And I think it's important to recognize, as I said before, first of all, there's no claim here arising from a creditor-debtor relationship. Secondly, there is no conduct that is charged here. Ultimately, the question has to be on the merits of the preemption issue. And this may tie back to what kind of preemption it is. I'm sorry. I couldn't hear you. And this may tie back into what kind of preemption it is. The question is whether the good-faith provision, 1112, would encompass a claim for dismissal on the ground that the directors of the corporation made the decision for Altaria to go into bankruptcy for Altaria motives. It's clear under 1112B that the claimant of a bad faith filing has, first of all, got to be a creditor. That's what this Court has held. It's got to be a bad faith in the creditor-debtor relationship. And the bad faith that's at issue here is, as Your Honor described it a few minutes ago, it is an intra-corporate, corporate law, breach of duty. It's not a duty that's regulated or posited on the Bankruptcy Code in the first instance. Under 1112B, when they're trying to decide whether there's good faith, is all that they look at whether the criteria for bankruptcy filing have been met? In other words, you can't pay your debts or use all those tests? No, there are cases that go beyond that, Your Honor, from what I've seen. However, in each instance, they go beyond that to the – in only one way, and that is the fairness to the creditor qua creditor, and not what we have at issue here. So even though there's fuzz and gloss beyond 1112B's language, which has been created at – in effect by Federal common law, I would submit, that gloss still stays within the basic principle of the statute, which is that this statute, this part of the code, is designed to preclude the filing of petitions that are intended or have the effect of deterring or harassing creditors. There's another thing I don't understand about 1112 preemption, which is if – supposing there was a cause of action under 1112 for good faith dismissal, if there was a dismissal, you would just be back to the fact that this cause of action could go forward anyway. That's correct. Can I ask – that's occurred to me while I listen to this. Why is it you concede that the particular claim that you made is an asset of the Stockholm? Well, there's two claims that were actually prosecuted at trial. One was the claim, the so-called LLNC claim, which was a claim that would either be sued on derivatively or, in this case, was sued on directly because it was assigned by the trustee for the corporation to my client. So they just sued on it as a direct claim. That was the claim of the corporation. The theory of that claim, of course, is that – But the one you recovered was really the individual claim, right? Well, the jury returned verdicts for our clients on both. That's what I'd like to get to on the cross-appeal issues, because we think they both need to be reinstated. It's very important that they are. Can I ask one question first? The Judge Alsop's instruction, second instruction, was at least quite confusing in terms of what the jury was supposed to be doing. He certainly could be read, and maybe is best read, as telling the jury to compare the before and after bankruptcy value rather than the before and after bankruptcy decision value. What turns on that? Well, I don't think anything turns on it, Your Honor, for a couple of reasons. One, there was no objection by any party, and that includes the ASIO defendants to that instruction. I think that's important in terms of fairness to the trial judge running a trial with a jury that's just come in with an inconsistent verdict. Unfortunately, probably all have been there. The fact is that the cause of action accrued, as we point out in our brief, as a matter of undisputed fact, if you accept the jury's findings, then as a matter of undisputed fact and as a matter of law, the cause of action accrued on May 3rd when the corporate resolution was passed. Now, were all the damages realized at that moment? No. Were any of the damages avoidable or mitigatable? Perhaps. If in the course of the bankruptcy things could have happened, that would have perhaps avoided the destruction of the corporation as a going concern. But that's not the point. The point for tort law is that the cause of action accrued on May 3. It was actionable then. What happened subsequently? Well, the damages actually went up because of the conversion of some stock, as we pointed out in our brief. It went up considerably. The judge, district court judge, erred, we submit, in failing to recognize that. The damages could have gone down, though. For example, in the bankruptcy, it would have been possible for the agio defendants to have been, if you will, detected in the scheme that we think was going on. And the bankruptcy court could have said, no, this court is not going to be a party to that, and they might have had to have actually reorganized the company. The company could have come out the other side instead of just the assets in the agio parties' hands. So even though those are both theoretical possibilities, the law still recognizes that the cause of action accrued when it was actionable, which was on May 3, notwithstanding what could have happened thereafter, whether it was by neutral event or as a natural consequence of the wrongdoing that did occur on May 3. So that jury instruction really has no effect for that reason, because the damage under the judge's, the rest of his instructions, and of course the instructions must be read as a whole, isolating one instruction, particularly under these circumstances where the jury has just come in with a verdict that the judge can't reconcile. Looking at all of his instructions as a whole, it's pretty apparent what this judge was doing. He was saying nothing that happened in the bankruptcy is actionable. But if the minority shareholder was frozen out and oppressed, if the corporation's assets to be free from bad decisions made in breach of fiduciary duty, if those two things occurred, then you may return verdicts for the plaintiff on either or both of those claims. Let me turn you to what the evidence was for the calculation of damages. Yes, Your Honor. I was a little confused, because we've got this preferred stock that has certain value, possibly, and we have the common shares that have certain value. In arriving at $2 per share, they had to have had some total figure that was then divided up. How did they do this? Well, the ruling by the court, again, without objection from either side, was that the jury was going to be asked to calculate or find the value of the common shares of stock in the corporation. And it did that and found $2 per share. That's not challenged in this appeal. It has not been challenged. Well, I'm just curious now, were they looking at market, or were they looking at assets? What were they looking at? There was a contemporaneous agreement just a week or two before these events between my client and an original owner of the stock that set the value at $2 a share in a circumstance where the parties really didn't have any incentive to distort the value of the stock. And a State court judge in a fairness proceeding on the settlement found that that was a reasonable. But what about the other end? The other end seems to be an assumption that it's now worth zero, and the question is when's the now? Okay. Well, I made third. It isn't self-evident that it was worth zero. It's probably self-evident that it was worth less, but, you know, but precisely because the bankruptcy may not happen or because it may have different consequences. I don't know. No one's expressed in the briefs why that number's zero. Okay. I think that's exactly the point. On May 3rd, let's imagine ourselves in the morning of May 3rd, and we have this contemporaneous agreement. Third party comes along. He's willing to pay $2 a share for the stock. Okay. Now, however, that evening, the same person comes along, and he looks at what's happened during the day. What's happened during the day is that a board of directors has passed a resolution to terminate the company's ongoing business and going concern value entirely. Now, that might have not occurred later, but what would you pay for the stock that evening? And the jury could, and I submit reasonably did find, that it was zero, because if there's no going concern. Interestingly enough, Ducks, this is the other issue, but on July 25th, when the agreement was proposed, didn't show up and say, wait a minute, wait a minute, this is now worth zero. We don't want to do this. This agreement can't go through. Well, actually, at that time, Ducks did not perceive and probably didn't have a ground for rescinding it because the only party who was a party to that agreement, that settlement agreement in 2001, was a party who, as far as we could tell, was totally innocent of any of the wrongdoing in the interim. So there really wasn't a basis for getting out of the settlement agreement, if you will. You're going to address the preferred shares and the common shares. Let me do that. The evidence here was undisputed, and there's been no objection to that evidence that the jury had before it was evidence that the common shares were worth $2 a share, and they had all of the evidence about the characteristics of the preferred shares and the common shares, and there was an agreement, a ruling by the Court with no objection, that the judge was going to take the jury's findings and calculate the damages on the corporation's claim, just the corporation's claim. And that's exactly what happened. The evidence on the preferred stock was that it was in all respects equal or superior. Excuse me. Strike that. The evidence was that the preferred stock was in all respects equal or superior in all of its characteristics to the common stock. And we went through all of those in our brief. So on page 50. But doesn't this depend at least in large part on what the essential implicit stipulation was? I mean, this is, as Judge Fletcher has been pointing out, a somewhat unorthodox way to prove the value of the overall corporate value, and nonetheless, there was an agreement to do it. So what was the agreement? If the agreement was to do it just from the common stock, which is what you said when you described it, then that was the agreement. No, the agreement was not. The agreement was that the stock value of the corporation, the stock value of the corporation, if the corporation has been destroyed in terms of its going concern value, the only way to use stock value to reasonably approximate under California law the amount of damages is to consider all the stock. The problem at trial, Your Honor, was that Ducks, because its expert witness on the preferred stock was stricken, could not prove the superior value of the preferred stock. So what was agreed to was that the jury would determine what there was evidence on, which was the common stock, but the agreement was that the stock of the corporation was going to be the basis for calculating damages to the corporation. Judge Alsup believed, and I submit erroneously, that there was no way, because there was no direct evidence, there was no way to include the preferred stock in the damages calculation. But that is not what California law required. The evidence did permit him, on undisputed evidence, to find the minimum value of that stock. It might have been worth $4 a share, but we know for sure, and he knew for sure, and had to know from the jury verdict and all the evidence before him, undisputed evidence, that the preferred stock was also worth at least $2 per share. The number of shares were in evidence, and so the calculation, the math as he called it, was quite simple. It should have been. I'm not sure that it meant that the stock was worth that. It was just agreed that the common stock was worth $2. Well, actually, there was good evidence that it was worth $2 a share because of the nature of the settlement agreement itself and the way it was presented at trial. The parties to that settlement agreement had no incentive to either distort the price up or down, and they submitted to the State court that presided over the good-faith settlement decision all the evidence, and there was a finding that the stock, the consideration given was fair for the value of the claims released, which essentially confirmed that the stock was worth in total about $400,000, because about $350,000 worth of claims were released. So there was evidence from which the jury could reasonably find that the common stock was worth $2 per share, and there's no challenge in this appeal to that verdict. So you have that verdict established for $2 a share. You have undisputed evidence that the preferred stock must be worth at least $2 a share, and you have an agreement as to the measure of calculation. I think this is important. We're not suggesting that the corporation's damages are lost in the value of its stock. We know what happened to the corporation. Its assets were destroyed. Its going concern value was destroyed. Its business was destroyed. How can you measure that? Well, one way to measure it, you could have experts come and talk about what the assets were worth and the good, you know, the good, the good, that's what I want, not good faith, the losing the word. I'm sorry? Goodwill. Goodwill, yes. I completely forgot that. You could do it that way. But another way to do it is to ask, how much would somebody pay for the stock before the wrongdoing and how much would they pay for all the stock afterwards? Well, at a minimum. You said at the outset that there was evidence before the jury with regard to the characteristics of the preferred shares. Yes. What was that evidence? All that, the following points were made in the evidence, and we summarized this at page 53 of our principal answer brief. First of all, each share, regardless of whether it was preferred or common, represented the same and equal quality stake in the corporation. They had the same voting rights at all shareholder meetings. The preferred was immediately convertible to common without qualification, without premium, without penalty. The liquidation rights of the two series, the two classes of stock, were identical. And in all other respects with regard to dividends, ability to control the board, and in all other respects, the preferred stock was unquestionably superior to the common stock. And when you look at that evidence, and there's nothing contrary to that evidence, when you look at all that evidence. What is the form of this evidence? A document, a? Yes. They actually had the preferred stocks certificates and an agreement relating to them that were in evidence. It's in our supplemental excerpts of record at page 186. And I see that my time has expired. Thank you very much.  Your Honor, I do need to dispose of one argument fairly quickly, which is the claim that there is any basis for a conclusion that damage occurred on May 3rd. That's the reason I went to the jury instructions and the verdict. The jury's only finding of value, and really the only evidence of value, is $2 a share, and that is the condition according to the jury. And I agree. There were no objections. The instructions and verdict are essentially law of the case. There was no damage. The value of the stock was $2 a share the moment before filing bankruptcy, and the damage occurred as the result of filing bankruptcy. There is no escape from that in this record. Where? Because of the form of the special verdict? Well, the form of the special verdict and the supplemental, the curative instruction in the court gave, which made clear that the jury's finding of damage related to the moment before and after bankruptcy. So the moment before bankruptcy, the stock is worth, whatever stock we're talking about, is worth $2 a share, and there is no evidence of any other prior value. The $2 a share comes out of the Dux-Chin settlement agreement. That's it as far as evidence of the value of the shares is concerned. So right up to the moment of filing. Sure. Just a minute. I want to know why that's true. The value immediately before the bankruptcy proceedings could have been zero. I'm sorry? The value immediately before the bankruptcy proceedings could have been zero. No. $2 could have represented the value on the morning of May 3rd. Does the form of the verdict preclude that? It does, and the instruction precludes it. The instruction, I'm not sure it does preclude it. Does the form of the verdict, I'm not sure I've seen the form. No, I'm referring to the curative instruction. I am referring to it as well. It's somewhat confusing, but it says they want to know what the value of any of the stock had immediately before the bankruptcy proceedings. Right. And have they proven that it had any value as of immediately before the bankruptcy? Now, that could have been the other end of the equation. That is, zero at that point and two on May 3rd. In other words, immediately before the bankruptcy proceedings, we want to know did it have value then. Because you have to compare that to what it was on May 3rd. All I can do is go back to the language. I don't need to. I'm just reading the language. I understand. But when you take the three pieces together, the original instruction, the verdict form, and the curative instruction, Judge Alsop is talking about the – when he says before and after, the context of his remark makes it very clear that it's before and after the bankruptcy. And we're talking about May 9th. And as much as counsel has tried to say that it's May 3rd, there's nothing in this – Well, the answer to that question was zero, and it was two on May 3rd. If so, then the jury would have had to find that the value was zero on May 9th. Right. But it didn't. And two on May 3rd, and therefore there was a loss of two. That's correct. But they found it was $2 a share on May 9th. That's what the finding says. That was the form of the verdict? That's what I don't know. I haven't seen it. That was the form of the verdict and Judge Alsop's instruction. His instruction was – I don't have the special verdict form in front of me. It says what was the value on May 9th. It says immediately before the bankruptcy. That was what had to be cleared up. But I believe when the Court goes back and reads those things together, there really isn't an escape from it. If I can turn to the filing requirement, I would only want to point the Court to its  It states on Page 1035, "... filings of bankruptcy petitioner a matter of exclusive Federal jurisdiction. State courts are not authorized to determine whether a person's claim for relief under a Federal law in a Federal court and within that court's exclusive jurisdiction is an appropriate one. And it's important to remember that in Gonzalez we had more than the debtor. We had the debtor's lawyer who was also subject to a lawsuit that this Court found preempted." That's not a debtor. It's not a creditor. Regarding his actions within the bankruptcy? Well, for having filed the bankruptcy. In other words, the suit was against the debtor and his lawyer for having filed. Wasn't it his actions in the bankruptcy? It was actually the filing. No, but the point here is that would adversely affect creditors to use the bright line. But how does this affect the creditors here? What was done? I think, Your Honor, that that's a false distinction. And the case law doesn't support. It seems to me that there are a lot of cases, maybe not so much in this circuit. I don't have a lot of clear cut knowledge. But it seems to me that's a line judges often draw in this area. Actually, no. In the Dutch party's brief, there is no case that draws that line. There are some. I just wrote an opinion for the Eleventh Circuit trying to draw that kind of distinction. Well, I did try to follow Your Honor's cases, but I hadn't read that one. It's not — I'm not saying that it's illogical to speak in those terms, but when the bankruptcy filing is, no matter how you slice it, the central act of the bankruptcy and the shareholders have interests, the directors and officers have interests, and the goal of the bankruptcy court is to adjust the relationships among all these parties. No one's denying that the bankruptcy court could have, you know, disposed of this claim as part of the ultimate resolution of the bankruptcy, but it didn't. It let the claim go back to, in effect, sold the claim back. But, I mean, the point was whether your argument has to be it had to consider it, and there's no other way of dealing with this issue. Well, there's a separate dispute in the case as to whether the bankruptcy court had the power to let the claim go back to be disposed of in State court, because we believe it could never be asserted in State court no matter what. Well, that's ultimately your argument. Well, yes. But in other words, that's a separate part of the case. The question is whether it was the only place to bring it in the first instance. Okay. But I'm past my time now, I believe. Thank you very much. Thank you. Thank you, counsel. Okay. Could you give us a little road map as to where we are now? I thought I'd better, Your Honor. My name is Merle Myers. I represent Lynn Shainman, who is the trustee of the George Chen Bankruptcy, as distinguished from the Long Life Bankruptcy. Ms. Shainman was sued by Dux in the Chen Bankruptcy case, presumably to overcome Judge Alsup's standing ruling. Right. And we haven't discussed that standing ruling at all. Not at all. No challenge to it. Not at all. So I'll give you a little background. And I think Judge Trager was trying to understand the distinction a little earlier between the corporate claims and the minority shareholder claims. It's the minority shareholder claims we're focused on. In the settlement agreement ---- Why aren't those completely redundant? I mean, at this point, if the corporate claims represent all of the value of the stock and the minority shares represent some of the value of the stock, why aren't they completely redundant? Your Honor, I'll defer to greater minds here. It's not an issue in our case. We've disposed of those claims. Right. So we don't care. Okay. But I'm wondering what the whole fuss is about this minority claim. Others might be able to opine on that. Your Honor, Your Honors, what happened is in the settlement agreement, as Your Honors know, Mr. Chen agreed to transfer shares of Long Life to Dux. But it didn't happen immediately. It was conditioned upon a good faith finding in the Superior Court as well as the expiration of a right of first refusal by other shareholders. That took several months. The agreement was made in April, and those conditions were satisfied in June. And, as you know, in between occurred these events from which arise these causes of action. So at the time, whether you're talking about the decision to file or the actual filing of the Long Life petition, either time Mr. Chen was the shareholder, and he was the one to whom those directors owed a fiduciary duty. The claims then for breach of that duty inured to him. But he had transferred the right to vote the stock already? He had, yes. But he had This was just a Was this a condition precedent or a condition subsequent? Condition The two conditions I mentioned. They were conditions precedent to the transfer of the stock. I was a little confused by that as well, because it seemed to me that the condition was a condition of the entire agreement, wasn't it? Yes. Well, then why wasn't it also a condition of the voting of the stock? Well, I think they accepted that out. It's not uncommon. You're trying to preserve some right pending the full effectiveness It's also not your problem, but I don't know why everyone is reading the agreement. Also so. Also so, Your Honors. Now, there's nothing in that settlement agreement that transfers the claims. They weren't really contemplated in April, but they could have been. The agreement could have said, and if there are any claims that arise from these shares between now and then, we'll assign those as well. It didn't. It says nothing of the sort. Judge Alsop found that none of that language provided any right, legal or beneficial or equitable in Dux to those minority shareholder claims, and that was Judge Montali's determination in the bankruptcy court as well. Now, Dux claims that the further assurances clause or alternatively the implicit covenant of good faith in every contract somehow brought that obligation up. Is the estate of George Chan or George Chen pursuing this cause of action separately? We settled it. We did file a lawsuit against the agio parties, and we settled it along with other litigation. I'm a little confused. Now, Dux got a, by virtue of the assignment, it got a judgment and damages against the corporation, and they get to keep those. That's on the corporate claim. That's right. So why is it, wouldn't this be a redundant? Sure. I don't know. That's what Judge Berzon asked me, too. I don't know. It's not our issue. If you decide that minority share claim, shareholder claims are worthless, it doesn't matter because we've resolved those. Well, no, my question was different anyway. Okay. Then I misunderstood it, and I'm sorry. There's nothing in the further assurances clause that gives Dux or gave Chen any obligation other than to ensure that the actual express obligations were fulfilled. The same is true of a good faith covenant. They don't create new rights, no matter how much the Dux parties would like to read that in. When that fails, they turn to Rule 17A, the ratification by a real party in interest in the FRCP. As we've set forth in our brief, Rule 17A is not a substantive law. It's simply a procedure by which a defendant can make sure that they're not going to get sued twice on the same claims. If you're not the legal owner or the real party in interest, you have a chance to bring in that party so that everyone is bound by the decision. But it doesn't create the rights to do that. And if they're not in the settlement agreement, Rule 17A isn't going to create them. So that ground for compelling the trustee to turn over those causes of action doesn't work either. Ultimately, what they brought was a complaint for specific performance. Basically, they wanted the trustee to transfer to them by this ratification one of the assets of the Chen bankruptcy estate. Rather than file an unsecured claim, because, after all, if Chen had an obligation to transfer those claims and didn't, it's simply a breach of contract. Rather than file a claim and get pennies on the dollar on a breach of contract claim, they chose instead to try to compel the trustee to turn over that asset. That is not an appropriate action in a bankruptcy case, nor is there a basis for specific performance. As we pointed out in our brief, there is a clear path to measuring the damages. Judge Alsop did it. He took the jury's verdict, determined how much of that was based on the minority shareholder claim, determined that that was $980,000, and reduced the judgment by that much. That's a pretty finite measurement of a contract claim of damages, and that negates the need for equitable relief such as specific performance. And I'll stop there. Thank you. Thank you very much. Yes. Yes. Where are we? We're done. We're done. We're done. I thought we had one more person arguing. I would love to. I am glad that we are done. Thanks all of you for a very good brief and a very good argument in a very complicated case.
judges: B. Fletcher, Berzon, Trager